UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHANIKA LASHAY ROBINSON,

                      Plaintiff,           Case No. 11-cv-11267
                                          Honorable Robert H. Cleland
                                          Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                      Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [7, 8]**

Plaintiff Shanika Lashay Robinson ("Robinson") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income benefits ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [7, 8], which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

For the reasons set forth below, the court finds that the Administrative Law Judge ("ALJ") erred in failing to properly consider whether Robinson's impairments medically equaled Listing 12.05 (Mental Retardation), in assessing Robinson's residual functional capacity, and in posing a hypothetical question to the vocational expert that did not include all of Robinson's impairments. Thus, the ALJ's conclusion that Robinson could perform a significant number of jobs in the national economy is not supported by substantial evidence. Accordingly, the court

recommends that the Commissioner's Motion for Summary Judgment [8] be DENIED, Robinson's Motion for Summary Judgment [7] be GRANTED IN PART to the extent it seeks remand and DENIED IN PART to the extent it seeks an award of benefits and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

## II.   REPORT

### A.   Procedural History

On March 13, 2008, Robinson filed an application for SSI, alleging disability beginning on February 25, 1984.  (Tr. 89-91).  The claim was denied initially on May 14, 2008.  (Tr. 46-49).  Thereafter, Robinson filed a timely request for an administrative hearing, which was held on December 16, 2009, before ALJ Paul R. Armstrong.  (Tr. 6-26).  Robinson (represented by attorney Kerry J. Spencer) testified at the hearing, as did vocational expert ("VE") Luann Castellana.  (Tr. 10-24).  On January 12, 2010, the ALJ found that Robinson was not disabled. (Tr. 31-42).  On January 28, 2011, the Appeals Council denied review.  (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on March 29, 2011 [1].

### B.   Background

#### 1.   Disability Reports

In an undated disability report, Robinson indicated that her ability to work is limited by "acid reflux, learning disabled, growth retardation syndrome, delayed motor and comprehension skills, scoliosis, hypothyroidism, double hernia, dislocated left shoulder, [and] rectum ruptures due to acid reflux."  (Tr. 106).  Robinson indicated that she had been seen by a doctor regarding both the physical and mental conditions that limited her ability to work.  (Tr. 108).  When asked to explain how these various conditions limit her ability to work, Robinson stated:

> I can't reach or lift over 10 lbs.  I can't stand for long periods of

> time due to my scoliosis.   I have problems reading and
> comprehending things at times.  I get tired when I walk for long
> periods of time.  I have a very limited ability to reach my arms
> over my head.

(Tr. 106).  She claimed that her conditions first interfered with her ability to work on February 25, 1984 (her date of birth) and that she became unable to work on that same date.  (*Id.*).  She was, however, briefly employed as a bagger at a grocery store during the summer of 2002.  (Tr. 107).  She worked four hours per day, five days a week in that job for approximately one month, and her duties included bagging groceries, putting groceries into cars, and cleaning bathrooms, though she indicated needing assistance with heavy bags.  (*Id.*).

In a function report dated April 3, 2008, Robinson reported that she lives "with family," and that her daily routine includes bathing, brushing her teeth, combing her hair, washing her face, dressing, and making her bed.  (Tr. 114).  She can assist her family with light household chores, such as dusting low areas, making beds and folding clothes, sometimes runs errands with her mother, and eats dinner with her family.  (Tr. 114, 116).  However, Robinson needs to be reminded to do her chores on a regular basis.  (Tr. 116).  She spends most of her time watching television and listening to music.  (Tr. 114).  For the most part, Robinson can dress and feed herself, although because she has very short arms, she needs assistance from her mother with bathing and caring for her hair.  (Tr. 115).  She needs reminders to take care of personal needs (such as taking her medication, bathing, and maintaining feminine hygiene), attend doctors' appointments, and complete household chores.  (Tr. 116).  Robinson can prepare some "limited" meals, like sandwiches, but cannot use the stove; essentially, her mother cooks meals, while Robinson helps out if something needs to be microwaved.  (*Id.*).  Robinson is not able to do outdoor chores like shoveling snow or pushing a lawnmower.  (*Id.*).  Robinson goes outside weekly with her parents for light exercise, but she cannot leave the neighborhood alone.  (Tr.

3

117).  She cannot drive a vehicle because, at her height (4'8"), she cannot reach the pedals, and because she finds it too "stressful."  (*Id.*; Tr. 10).  She cannot pay bills, handle a savings account, or use a checkbook; her parents do these things for her.  (Tr. 117).  Robinson spends time with her family and extended family, goes to church, attends doctors' appointments, and goes to the mall on a regular basis, but cannot do so alone.  (Tr. 117-118).

When asked to identify functions that are impacted by her conditions, Robinson checked numerous items related to both her physical and mental abilities, including lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, completing tasks, concentration, understanding, following instructions, and using her hands.  (Tr. 119).  She indicated that her attention span is short, she has problems concentrating and staying focused, and that she often fails to finish what she started.  (Tr. 119, 121).  She has to be coached or instructed on how to follow directions.  (Tr. 119).  She responds well to authority figures, but does not handle stress well.  (Tr. 120).  Robinson indicated that, under stress, she can have physical responses, such as vomiting and acid reflux episodes.  (*Id.*).  She does not handle changes in routine well and "must be coached to adapt."  (*Id.*).  When asked whether she has any unusual behavior or fears, Robinson indicated that she is "nervous, fearful, panicky" in stressful situations, and that she is "extremely afraid of dogs and loud animals."  (*Id.*).

In an undated disability appeals report, Robinson indicated that she has been suffering from "delayed motor and comprehension skills, growth retardation syndrome (dwarfism), scoliosis, thyroidism, chronic sinusitis, and a double hernia," that her daily activities remain limited because of these conditions, and that her condition has not changed since the date of her last disability report.  (Tr. 128).  Robinson was born with these conditions and, in her mother's words, "will always have challenges that she alone cannot conquer because of her mental and

physical disabilities . . . ."  (Tr. 129).

           2.      *Plaintiff's Testimony*

At the December 16, 2009 hearing before the ALJ, Robinson testified that she could not

live on her own, and that her mother assists her with many activities of daily living.  (Tr. 17-18).

Specifically, Robinson's mother cooks for her, washes her hair for her, and has to remind her to

do household chores.  (Tr. 18-19).  Robinson also testified that, although she tried to obtain a

driver's license, she has been unsuccessful; driving was "stressful" for her, and she panicked

when she got on the road.  (Tr. 10).  Robinson graduated from high school with a 3.3 grade point

average, taking a combination of "regular" classes and "Special Ed" classes.  (Tr. 14).  Robinson

testified that she took three years' worth of business administration classes in college, but did not

finish the program because it got stressful and she "almost flunked out."  (Tr. 10-11).

Robinson testified that, despite her physical impairments, she can type fifteen words per

minute[1] and can answer the phone; but, she cannot multitask, and can only follow one instruction

at a time.  (Tr. 13, 15-17).  Robinson further testified about her grocery store bagger position, but

said that standing on her feet for long periods of time made her back hurt, and she was unable to

lift some of the heavy bags.  (Tr. 12, 17).  Other than that, her only work experience has been in

a "job coach" situation, where she earned a total of $143 in 2008.  (Tr. 11-12).  The ALJ himself

recognized the difficulty Robinson would have performing even simple work tasks on her own;

while questioning Robinson about whether she would be capable of selling popcorn at a movie

theater, the ALJ admonished her that she would not be allowed to eat the popcorn while on duty

because "that's one of the no-no's."  (Tr. 16).

---

[1] As the ALJ noted at the hearing, typing fifteen words a minute is "not great."  (Tr. 13).  Indeed, the ALJ commented, "I could probably almost do that myself and I type with one finger."  (*Id.*).

3.      *Medical Evidence*

a.      *Treating Sources*

Dr. Jeanette Campbell is a pediatrician who has treated Robinson since her birth in 1984. In an October 2007 Medical Examination Report completed for Michigan's Department of Human Services, Dr. Campbell indicated that Robinson could lift less than ten pounds only occasionally and could stand/walk for less than two hours in a regular work day.  (Tr. 176).  She also stated that, due to decreased range of motion in her upper extremities, Robinson was incapable of pushing/pulling, fine manipulation, and could not operate foot/leg controls.  (*Id.*). She further opined that Robinson was limited in comprehension, following simple directions, and social interaction.  (*Id.*).  In addition, Dr. Campbell noted that Robinson needed "special coaching" and assistance with chores and "personal skills" within the home.  (*Id.*).  The ALJ eventually discounted Dr. Campbell's medical opinions in large part because her October 12, 2007 office notes indicate that Robinson had received a certificate from Baker College in "office skills"; however, Dr. Campbell's Medical Examination Report puts this accomplishment in perspective, apparently specifying that Robinson was unable to complete the entire "office support" program and had reached her "maximum mental capacity" – as discussed below, essentially equivalent to that of third or fourth grade child.  (Tr. 176, 252).  Dr. Campbell's November 25, 2008 office notes indicate that she had suggested that Robinson be referred for guardianship proceedings.  (Tr. 251).

In December 2008, Dr. Campbell referred Robinson to Dr. Sayyed Sohrab, a neurologist. Dr. Sohrab noted that Robinson had a "history of intrauterine growth retardation (IUGR) as an infant and some mental delay," and had been referred to him "because of some physical findings including absence of reflexes by Dr. Campbell."  (Tr. 247).  During his examination, Dr. Sohrab

6

noted that Robinson had intact long-term memory, could follow commands and did not appear to have difficulty with understanding. (*Id.*). In conclusion, Dr. Sohrab noted that Robinson had a history of IUGR and "subsequent mental delay," but found no indication of "new or acute neurological problems." (*Id.*).

On November 6, 2009, Dr. Campbell submitted her "Answers to SSI request," noting that she had treated Robinson since birth. (Tr. 254). In these notes, she stated that Robinson needs assistance and supervision to maintain her daily living and that she is "performing below average." (*Id.*). Dr. Campbell concluded: "I do not feel [Robinson] can maintain a full-time job." (*Id.*).

### b. Consultative and Non-Examining Sources

#### (1) Dr. Ratcliff

On April 26, 2008, Paul Ratcliff, D.O., conducted a consultative physical examination of Robinson. Ratcliff noted that Robinson is "extremely short and small in stature suggesting some degree of dwarfism." (Tr. 186). Dr. Ratcliff further noted that Robinson "exhibited a mild S-shaped scoliosis," but had a normal gait and full range of motion in all her joints. (*Id.*). Her straight leg raise testing was negative, and there was no tenderness, erythema, or effusion of any joint. (*Id.*). Robinson had no difficulty getting on and off the examination table, no difficulty heel and toe walking, and no difficulty squatting. (*Id.*). She also had intact grip strength, full dexterity in her hands, and was able to pick up a coin, button a shirt, and open a door without difficulty. (*Id.*). In summary, Dr. Ratcliff concluded that Robinson had "no difficulty with gait or orthopedic maneuvers." (Tr. 187).

#### (2) Mr. Matouk

On April 17, 2008, Michael Matouk, M.A., L.L.P., conducted a consultative

psychological evaluation of Robinson.[2]   In connection with this examination, Mr. Matouk reviewed two reports, which were 21 and 14 years old, respectively.  (Tr. 188).   At this evaluation, Robinson reported that she fears dogs and bugs, and has test anxiety.  (*Id.*).  She has difficulty with high-stress situations like driving and concentrating.  (*Id.*).

Cognitive function tests administered at this examination found Robinson's Full Scale IQ to be 71, which is in the third percentile, and is classified as in the "borderline" range.  (Tr. 189).  Her Verbal IQ score was 73, which is in the fourth percentile and also classified as "borderline."  (*Id.*).   Likewise, her Performance IQ score was 73, falling in the fourth percentile and the "borderline" range.  (*Id.*).  On a test of verbal comprehension, Robinson scored in the "impaired range," which, according to Mr. Matouk, "suggests that she has poor social judgment and also that she may not comprehend information in the verbal domain."  (Tr. 190).  Her "arithmetic reasoning skills were measured at the 1st percentile, also suggesting Impaired functioning in this domain."  (*Id.*).  Indeed, of the eleven cognitive subtests administered to Robinson, she scored in the fifth percentile or below on five of the eleven, and in the ninth percentile or below on eight of the eleven.  (*Id.*).

On reading, spelling and arithmetic tests, Robinson scored in the third to fourth grade range (borderline to impaired).  (*Id.*).  Although she was able to manipulate multi-digit addition and subtraction equations, she could not multiply multi-digit numbers or "perform the most simple division equations."  (Tr. 191).  Her drawings on a test of perceptual motor functioning also indicated low-average functioning.  (*Id.*).  She could reproduce geometric figures, while preserving the *Gestalt* of these, but she finished the drawings slowly, and they were small and were arranged in a disorganized and haphazard fashion on the paper.  (*Id.*).

---

[2]  Mr. Matouk's assessment was also signed by Terence Campbell, Ph.D., a licensed psychologist.  (Tr. 194).

In his examination, Mr. Matouk noted that Robinson was dressed appropriately, neat, clean and well-groomed.  (*Id.*).  She appeared "fairly tense" but was cooperative.  (*Id.*).  With respect to "Concentration and Attention," Mr. Matouk stated:

> Ms. Robinson was able to count with serial 3's, missing a few numbers up to 50.  She had great difficulty performing reverse serial 3's, though she did serial 2's very slowly.  The claimant was able to spell the word *world* forward and incorrectly backwards (dlorw).

(*Id.*).  With respect to memory, Robinson could remember three out of three objects immediately and two out of three objects after a lapse of three minutes.  (Tr. 192).  Moreover, she could remember four digits forward and three digits backward with consistency.  (*Id.*).  While her remote memory was "poor," her recent memory was "fair."  (*Id.*).  Her ability to determine similarities was "adequate," and her judgment was described as "marginal to adequate."  (*Id.*).  In conclusion, Mr. Matouk stated that Robinson:

> . . . evidences cognitive, social and emotional limitations that produce ***substantial impairment in her vocational and daily living functions***.  Psychometric assessment reveals Borderline intellectual functioning in the context of poor academic achievement functioning, generally ranging at the 3rd to 4th grade levels.  She also evidences moderate difficulty with attentional deployment and concentration and also poor remote and short term memory recall skills.  Her profile suggests a cognitive deficit in addition to anxiety that is likely exacerbating her condition.
>
>         \*      \*      \*
>
> At the present time, she appears incompetent to manage her financial affairs and/or benefits.

(Tr. 193) (emphasis added).  Mr. Matouk characterized Robinson's prognosis as "Fair to Guarded."  (*Id.*).

### (3)     Dr. Pinaire

In May 2008, Dr. Blaine Pinaire, a state agency psychologist, reviewed Robinson's medical records and completed a Mental Residual Functional Capacity Assessment.  Dr. Pinaire

9

opined that Robinson had mild limitations with respect to her activities of daily living and maintaining social functioning, and moderate limitations with respect to maintaining concentration, persistence, or pace.[3]  (Tr. 214).   He also noted that Robinson suffers from Borderline Intellectual Functioning ("BIF") and Anxiety Disorder, medically determinable impairments that do not precisely satisfy the diagnostic criteria for Listing 12.05 (Mental Retardation) or 12.06 (Anxiety-Related Disorders).   (Tr. 206-07).   However, Dr. Pinaire concluded that Robinson was capable of performing unskilled tasks.  (Tr. 200).

4.    *Vocational Expert's Testimony*

Luann Castellana testified as a vocational expert ("VE") at the hearing before the ALJ. (Tr. 21-25).  The ALJ asked the VE to imagine a claimant of Robinson's age "with a high school education, maybe some college, you know, that's debatable," who was limited to unskilled, light work with a "SVP rating" of 1 or 2[4] that precluded multitasking, who could lift no more than ten pounds, and who could reach no more than six feet high.  (Tr. 21-23).  The ALJ did not include in his hypothetical any reference to Robinson's Borderline Intellectual Functioning diagnosis. (*Id.*).   Based on the limitations presented, the VE identified thousands of jobs that this hypothetical individual could perform, including light packaging, sorting, assembling, and ticket selling jobs.  (Tr. 23).   Robinson's counsel then asked the VE whether the hypothetical

---

[3]  Specifically, Dr. Pinaire adjudged Robinson to be moderately limited in the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting.  (Tr. 198-99).

[4]  The Dictionary of Occupational Titles (DOT) lists a specific vocational preparation (SVP) time for each described occupation.   For instance, using the skill level definitions in 20 CFR §404.1568 and §416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9.  *See* SSR 00-4p.

10

individual would still be able to perform these jobs if she required coaching with respect to following instructions and/or needed to be in a "job coach sort of situation." (Tr. 24). The VE indicated that, with those limitations, the individual would not be capable of performing competitive work. (Tr. 24-25). The VE actually went further, and commented that it "sounds like she was in [such a situation], somewhat involved in or headed in [] that direction."

### C.    Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the

11

> claimant can perform, in view of his or her age, education, and
> work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331 (E.D. Mich. Dec. 6, 2011), *citing* 20

C.F.R. §§404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir.

2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers

to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir.

1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Robinson was not

disabled because she was capable of performing a significant number of jobs that exist in the

national economy.  (Tr. 40).  At Step One, the ALJ found that Robinson had not engaged in

substantial gainful activity since March 13, 2008, the application date.  (Tr. 33).  At Step Two,

the ALJ found that Robinson had both physical and mental severe impairments, including short

stature, scoliosis, borderline intellectual functioning, and anxiety disorder.  (*Id.*).  The ALJ also

found that, although Robinson has been diagnosed with gastroesophageal reflux disease

("GERD"), this impairment did not significantly limit her ability to perform work-related

activities and, thus, was not a "severe impairment."  (*Id.*).

At Step Three, the ALJ found that none of Robinson's severe impairments met or

medically equaled a listed impairment.  (Tr. 34).  Specifically, with respect to Robinson's mental

impairments, the ALJ considered Listings 12.05 (for mental retardation) and 12.06 (for anxiety

disorders) and found that Robinson's impairments, considered singly and in combination, did not

meet or medically equal the criteria of either of these Listings.  (Tr. 34-36).

The ALJ then assessed Robinson's residual functional capacity ("RFC"), considering the

12

degree of limitation found in the mental function analysis, and concluded that Robinson was capable of performing simple, unskilled light work as defined in 20 C.F.R. §416.967(b), except that she was precluded from work requiring multitasking, lifting items that weigh more than ten pounds, and reaching a height exceeding six feet.  (Tr. 36).  At Step Four, the ALJ determined that Robinson had no past relevant work.  (Tr. 39).  At Step Five, the ALJ concluded that, based on the VE's testimony, Robinson could perform a significant number of jobs in the national economy such that she was not disabled.  (Tr. 40).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d

at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

In concluding that Robinson is not disabled under the Act, the ALJ erred in three respects. First, the ALJ erred in failing to properly consider whether, with her Borderline Intellectual Functioning diagnosis and other mental and physical impairments, Robinson medically equaled the criteria for Listing 12.05 (Mental Retardation). Second, even if the ALJ correctly concluded that the criteria for Listing 12.05 were not met, he erred in giving no weight to the opinion of Robinson's treating physician, Dr. Campbell, in concluding that Robinson had

14

the residual functional capacity to perform simple, unskilled light work.  Finally, the ALJ erred

in failing to provide the VE with a hypothetical that included all of Robinson's physical and

mental impairments.

> 1.    *The ALJ Erred at Step Three in Failing to Properly Consider Whether*
> *Robinson's Impairments Medically Equaled the Criteria for Listing 12.05*

At Step Three of his analysis, the ALJ concluded that "[t]he claimant's mental

impairments, considered singly and in combination, do not meet or medically equal the criteria

of Listings 12.05 [Mental Retardation] and 12.06 [Anxiety Disorders]."  (Tr. 34).  Listing 12.05

(Mental Retardation) provides:

> Mental retardation refers to significantly subaverage general
> intellectual functioning with deficits in adaptive functioning
> initially manifested during the developmental period; i.e., the
> evidence demonstrates or supports onset of the impairment before
> age 22.
>
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.
>
> A.   Mental incapacity evidenced by dependence upon others for
> personal needs (e.g., toileting, eating, dressing, or bathing) and
> inability to follow directions, such that the use of standardized
> measures of intellectual functioning is precluded;
>
> OR
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70
> and a physical or other mental impairment imposing an additional
> and significant work-related limitation of function;
>
> OR
>
> D. A valid verbal, performance, or full scale IQ of 60 through 70,
> resulting in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or

15

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace;[5] or

4. Repeated episodes of decompensation, each of extended duration.

*Id.*  Although the ALJ devoted the majority of his Step Three analysis to consideration of the paragraph D criteria,[6] he specifically indicated that he considered the "paragraph A, B, C, and D" criteria of Listing 12.05 in concluding that Robinson's severe impairments did not meet or medically equal a listed impairment.  (Tr. 34-35).  It is the 12.05(C) criteria that are now principally at issue.

As the Sixth Circuit has summarized, in order to satisfy Listing 12.05(C), a claimant must make three showings:  (1) she experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" (i.e., the diagnostic description);[7] (2) she has a "valid verbal, performance, or full scale

---

[5] As explained by the ALJ, a "marked" restriction is one that is "more than moderate but less than extreme."  (Tr. 34).  *See* Listing 12.00(C) ("Where we use 'marked' as a standard for measuring the degree of limitation, it means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.").

[6] The ALJ's conclusion that Robinson's impairments do not medically equal the paragraph D criteria is questionable.  For example, Mr. Matouk opined that Robinson "evidences cognitive, social and emotional limitations that produce **substantial impairment** in her vocational and daily living functions."  (Tr. 193) (emphasis added).  Dr. Campbell reached a similar conclusion. (Tr. 254).  The ALJ's conclusion that Robinson has only mild limitations in activities of daily living and maintaining social functioning and moderate limitations maintaining concentration, persistence, or pace is at odds with these two medical opinions.  (Tr. 34).  On remand, the ALJ should reconsider application of the paragraph D criteria in light of the court's recommendation, giving due weight to those two medical opinions.

[7] The Sixth Circuit has held that satisfaction of this prong does not require a qualifying IQ score before the age of 22; rather, it simply requires evidence that the claimant's subaverage intellectual functioning initially manifested during the developmental period.  *See West v. Comm'r Soc. Sec. Admin.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007).

16

IQ of 60 through 70"; and (3) she suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See West v. Comm'r Soc. Sec. Admin.*, 240 Fed. Appx. 692, 697-98 (6th Cir. 2007). In this case, however, with respect to the paragraph C criteria, the ALJ only addressed the second factor discussed above, saying:

> The paragraph 'B' and 'C' criteria are not met because there is no evidence in the claimant's records that she has received a valid Full Scale, Verbal, or Performance IQ score below 70. At her April 2008 consultative psychiatric examination, cognitive functioning tests found the claimant's Full Scale IQ to be 71, her Verbal IQ to be 73 and her Performance IQ also to be 73.

(Tr. 35-36) (internal citations omitted). Although the ALJ may have correctly concluded that Robinson did not *meet* the criteria for Listing 12.05(C) because she did not have an IQ score under 70, the record evidence suggests that Robinson may satisfy the diagnostic description and clearly establishes that she suffers from a physical or mental impairment imposing an additional and significant work-related limitation of function. Given these facts, as well as Robinson's Full Scale IQ score of 71, the ALJ's failure to fully and properly consider whether Robinson's impairments *medically equaled* Listing 12.05(C) constitutes error.

In situations like this, courts have noted the Commissioner's issuance of instructions for determining medical equivalence in the Program Operations Manual System ("POMS"). *See Shontos v. Barnhart*, 328 F.3d 418 (8th Cir. 2003). The POMS is a policy and procedure manual that does not have the force of law but is "nevertheless persuasive." *See Davis v. Sec'y of Health and Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989). The applicable POMS provision for determining medical equivalence with respect to mental retardation under Listing 12.05(C) states, in relevant part:

> Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment. The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. **However, slightly**

17

**higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination.** It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS § DI 24515.056 (emphasis added). Here, there is no evidence that the ALJ considered the POMS guidelines. In fact, in reaching his decision that Robinson did not meet or medically equal Listing 12.05(C), the ALJ appears to have ignored the POMS guidelines, ending his analysis at a recital of Robinson's IQ scores. Where the ALJ explicitly found that Robinson suffers from other physical and mental impairments – including short stature, scoliosis, and anxiety disorder (Tr. 33) – and given Robinson's IQ score was above the Listing threshold by only the slimmest of margins, his failure to consider the POMS guidelines constitutes error warranting remand. *See, e.g., Shontos*, 328 F.3d at 424-25 (concluding that claimant's impairments, including borderline intellectual functioning, psychiatric affective disorders, and physical disabilities were medically equivalent to Listing 12.05(C) and remanding for an award of benefits); *Spratt v. Astrue*, 2012 WL 1110018 (N.D. Iowa Apr. 2, 2012) (remanding for a determination of whether claimant's borderline intellectual functioning, combined with his depressive disorder and history of polysubstance dependence, were medically equivalent to Listing 12.05(C)).

   2.   *The ALJ Erred in Assessing Robinson's Residual Functional Capacity by Giving "No Weight" to the Opinions of Robinson's Treating Physician*

The ALJ's residual functional capacity ("RFC") finding is not supported by substantial evidence and is the product of legal error because he improperly gave no weight to the opinion of Robinson's treating physician, and too much weight to Dr. Pinaire's opinion that Robinson could perform simple, unskilled work.

In determining the effect of Robinson's *physical* impairments on her RFC, the ALJ

considered extensively physicians' assessments in connection with: a May 2007 emergency room visit; her April 2008 consultative examination with Dr. Ratcliff; and her December 2008 physical examination by Dr. Sohrab. (Tr. 37). In doing so, the ALJ concluded that, although Robinson's short stature limited the range of work-related activities she could perform, there was otherwise insufficient evidence that Robinson was unable to work. (*Id.*).

With respect to the effect of Robinson's *mental* impairments on her RFC, the ALJ found "particularly persuasive" the opinion of Dr. Pinaire, a state agency psychologist. Dr. Pinaire never examined Robinson, but merely reviewed her medical records. (Tr. 36). After doing so, he concluded that, although Robinson had (in his opinion) mild limitations with respect to her activities of daily living and maintaining social functioning, and moderate limitations with respect to maintaining concentration, persistence, or pace, she was capable of performing unskilled work. (Tr. 200, 212). The ALJ afforded Dr. Pinaire's opinion "substantial weight," finding it "consistent with the totality of the evidence contained in the claimant's records and the claimant's hearing testimony." (Tr. 36). In reality, however, Dr. Pinaire's opinion is inconsistent with the opinions of Robinson's treating physician, the psychologist who performed an independent evaluation of Robinson, Robinson's own hearing testimony, and even the ALJ's own hearing comments.

Dr. Jeanette Campbell, a pediatrician who has treated Robinson since birth, opined in an October 2007 Medical Examination Report that Robinson was limited in comprehension, following simple directions, and social interaction. (Tr. 176). In addition, Dr. Campbell noted that Robinson needed "special coaching" and assistance with chores and "personal skills" within the home. (*Id.*). In November of 2008, Dr. Campbell suggested that Robinson be referred for guardianship proceedings. (Tr. 251). And, in November of 2009, Dr. Campbell stated that

Robinson "needs assistance and supervision to maintain her daily living," was "performing below average," and cannot maintain a full-time job.  (Tr. 254).  The ALJ gave Dr. Campbell's opinion "no weight" because, in his words, she "fail[ed] to support her conclusion with objective medical evidence or clinical findings and observations:"[8]

> Although the claimant's evidence demonstrates that she suffers from significant cognitive deficiencies, Dr. Campbell does not cite specific clinical observations or findings that support her opinion that the claimant is precluded from performing any sort of work-related activity on a sustained basis.  Indeed, in reaching this conclusion, Dr. Campbell appears to have ignored her earlier notation of the claimant's office skills certificate from Baker College.  This particular oversight encapsulates Dr. Campbell's broader failure to analyze how the claimant's findings, observations, and remarks support the imposition of specific functional restrictions.  (Tr. 39).

The applicable regulations provide that:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §404.1527(c)(2).  An ALJ must give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §416.927(c)(2).  The applicable regulation further provides that:  "We will always give good reasons in our notice of determination or decision for the weight we give your

---

[8] The ALJ dismissed Dr. Campbell's opinion that Robinson could not maintain a full-time job, in part, because "the determination of whether a claimant is disabled is reserved for the Commissioner of the Social Security Administration, not examining professionals."  (Tr. 39). While this may be a correct statement of the law, the fact that Dr. Campbell offered an opinion on the ultimate issue is not reason to completely discount the other evidence she provided.

treating source's opinion."  20 C.F.R. §416.927(c)(2).

In this case, the ALJ erred in giving no weight to Dr. Campbell's opinion.  With respect to Robinson's mental impairments, Dr. Campbell's opinion is both supported by at least some "medically acceptable clinical and laboratory diagnostic techniques" and appears to be consistent with other evidence in the record.  Cognitive function tests administered by Mr. Matouk in 2008 found Robinson's Full Scale IQ to be 71 (third percentile), her Verbal IQ to be 73 (fourth percentile), and her Performance IQ to be 73 (fourth percentile).  (Tr. 189).  All of these scores were in the "borderline" range.  (*Id.*).  On a test of verbal comprehension, Robinson scored in the "impaired range," and her "arithmetic reasoning skills were measured at the 1st percentile, also suggesting Impaired functioning in this domain."  (Tr. 190).  On reading, spelling and arithmetic tests, Robinson scored in the third to fourth grade range (borderline to impaired).  (*Id.*).[9]  This objective evidence certainly supports the opinions of Robinson's treating physician.[10]

Moreover, other evidence in the record is consistent with Dr. Campbell's opinions.  Robinson is unable to live alone; needs assistance from her mother with bathing and caring for her hair; needs reminders to take care of personal needs (such as taking her medication, bathing, and maintaining personal hygiene); needs reminders to attend doctors' appointments and complete household chores; cannot leave the neighborhood alone; cannot drive; and cannot pay bills, handle a savings account, or use a checkbook.  (Tr. 114-18).  Robinson presented at least

---

[9] That Robinson can watch television, listen to music, and read magazines (apparently at a third or fourth-grade level) may show that she "retains a measure of audiovisual comprehension skills," (Tr. 38), but here, considering Robinson's severe cognitive limitations, those skills do not translate into evidence of an ability to perform ongoing, productive work.

[10] Dr. Campbell's opinion is consistent with both Matouk's finding that Robinson had "cognitive, social and emotional limitations that produce substantial impairment in her vocational and daily living functions," (Tr. 193), and the ALJ's similar finding.  (Tr. 37-38) ("Evidence regarding [Robinson's] borderline intellectual functioning and anxiety disorder similarly demonstrates the presence of severe impairments that significantly limit [her] ability to perform work-related activities.").

some evidence that she used a "job coach," and that even with one, she earned a total of only $143 in 2008. (Tr. 11-12).[11]  Robinson testified at the hearing that although she can answer phone calls, she can type only fifteen words a minute and cannot multitask. (Tr. 13, 15). Robinson graduated from high school, but did so only by attending a combination of special education and "regular" classes. (Tr. 14). And, although she attended classes at Baker College and received an "office skills" certificate, she was unable to complete the program of study because she "almost flunked out."[12]  (Tr. 11, 189). Thus, where Dr. Campbell's opinion is supported by objective clinical findings and by other record evidence, it was error for the ALJ to give it no weight.

Finally, the regulations specify that if the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Here, all of these factors weigh in favor of according Dr. Campbell's opinion at least some, if not substantial, weight. Dr. Campbell has been Robinson's primary care provider since birth. (Tr. 254). She

---

[11] In this regard, the court also notes the incongruity between the ALJ's instruction to Robinson at the hearing that if she worked as a vendor at the movie theater she would not be allowed to eat the popcorn, and Dr. Pinaire's finding (which the ALJ apparently found "particularly persuasive") that Robinson was not significantly limited in her ability to "sustain an ordinary routine without special supervision." (*Cf.* Tr. 16 with Tr. 198).

[12] The ALJ dismissed Dr. Campbell's opinion, in large part, because of a belief that "Dr. Campbell appears to have ignored her earlier notation of the claimant's office skills certificate from Baker College." (Tr. 39). As explained above, however, Dr. Campbell's October 2007 report puts this accomplishment in perspective, specifying that Robinson was unable to complete the entire "office support" program and had reached her "maximum mental capacity" which is clearly very limited. (Tr. 176).

has treated Robinson for close to three decades, for both physical and mental impairments; a more all-encompassing physician-patient relationship can hardly be imagined.  Thus, the ALJ erred in giving Dr. Campbell's opinion no weight.[13]

For all of these reasons, the court concludes that the ALJ's residual functional capacity analysis is not supported by substantial evidence.  Therefore, the court should remand in order to permit the ALJ to determine the impact an error-free assessment of the record evidence will have on his residual functional capacity determination.

> 3.   *The ALJ's Hypothetical Question to the Vocational Expert Failed to Include all of Robinson's Credible Limitations*

At the administrative hearing, the ALJ asked VE Luann Castellana whether jobs would be available for an individual with "a high school education, maybe some college," who was limited to unskilled, light work with an SVP rating of 1 or 2 that precluded multitasking, lifting more than ten pounds, and reaching more than six feet high.  (Tr. 21-23).  The ALJ did not include in his hypothetical any reference to Robinson's Borderline Intellectual Functioning diagnosis.  (*Id.*).  Based on these limitations, the VE identified thousands of jobs that Robinson could perform, including packaging, sorting, assembly, and ticket selling jobs.  (Tr. 23).  As a result, the ALJ concluded that Robinson was not disabled under the Act.  (Tr. 40).

An ALJ may rely on the testimony of a vocational expert to determine whether jobs would be available for an individual who has workplace restrictions.  *See Wilson*, 378 F.3d at 548.  However, in order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform

---

[13] It is also worth noting that, as a non-examining physician, Dr. Pinaire's opinion would generally be entitled to less weight than either Dr. Campbell's or Matouk's.  *See Dragon v. Comm'r of Social Security*, 2012 WL 987758, at *8 (6th Cir. Mar. 26, 2012) ("In weighing medical opinions, generally, a treating source is to be given more weight than an examining source and an examining source [] more weight than a non-examining source [].") (citing 20 C.F.R. § 404.1527(d)(1)-(2)).

other work, the question must accurately portray a claimant's physical and mental impairments. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Where the hypothetical questions fail to reflect each of the claimant's limitations that are supported by substantial evidence, the vocational expert's answer has no evidentiary value. *See Paden v. Barnhart*, 92 Fed. Appx. 465, 468 (9th Cir. 2004). Here, Robinson's Full Scale IQ was 71, and she was diagnosed with Borderline Intellectual Functioning ("BIF"). (Tr. 206). The ALJ noted these facts and found that Robinson's BIF was a severe impairment. (Tr. 33, 38). However, the ALJ erred when he failed to include this limitation in the hypothetical question he posed to the VE.

Although the Sixth Circuit has not yet expressly addressed this issue, numerous other courts have specifically held that BIF should be included in the hypothetical questions posed to the vocational expert. In *Grissom v. Barnhart*, 416 F.3d 834 (8th Cir. 2005), the court remanded the case to the ALJ because the hypothetical posed to the VE did not reference the claimant's BIF, saying:

> We have previously concluded that borderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert. While borderline intellectual functioning may not rise to the level of a disability by itself, a claimant is nevertheless entitled to have a vocational expert consider this condition along with [her] other impairments to determine how it impacts upon the claimant's residual functional capacity.

*Id.* at 837 (internal citations omitted); *see also Paden*, 92 Fed. Appx. at 467-68; *Hunt v. Massanari*, 250 F.3d 622, 626 (8th Cir. 2001) (remanding to consider the BIF of a claimant with Full Scale IQ test results of 77 and 74); *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir. 1997) (remanding for VE to consider the BIF of a claimant with a Full Scale IQ of 78); *Pickney v. Chater*, 96 F.3d 294, 296-97 (8th Cir. 1996) (remanding because ALJ did not instruct VE to consider the BIF of a claimant with a Full Scale IQ of 78); *Burns v. Barnhart*, 312 F.3d 113,

122-23 (3d Cir. 2002) (remanding because ALJ's use of the factor of "simple, repetitive one, two-step tasks" in the hypothetical to the VE did not adequately encompass the claimant's BIF); *Covington v. Astrue*, 2011 WL 1539786 (E.D. Pa. Apr. 22, 2011) (remanding where the hypothetical posed to the VE – which limited the claimant to "simple, routine, unskilled work" – did not sufficiently account for the claimant's BIF); *Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990) (failure to make VE aware of claimant's severe mental impairments is error).  The ALJ's failure to formulate a hypothetical that included Robinson's BIF constitutes error warranting remand.

Moreover, not only did the ALJ fail to include Robinson's BIF in the hypothetical presented to the VE, but he compounded his error by specifically indicating to the VE that she should consider an individual "with a high school education, maybe some college . . . ."  (Tr. 22). In doing so, the ALJ substantially overstated Robinson's intellectual capabilities.  Robinson graduated from high school, but only with the extraordinary support of her family and by taking a combination of regular and special education classes.  (Tr. 14).  *See Dragon*, 2012 WL 987758, at *8.  And, although she took some classes at Baker College, she "almost flunked out."  (Tr. 11). What is more significant is that Robinson's Full Scale IQ is 71 (third percentile), and that she scored in the "impaired range" on a test of verbal comprehension.  (Tr. 189).  Her "arithmetic reasoning skills were measured at the 1st percentile, also suggesting Impaired functioning in this domain."  (*Id.*).  On reading, spelling and arithmetic tests, Robinson scored in the third to fourth grade range (borderline to impaired).  (*Id.*).

Recently, in a very similar case, a court in the Eastern District of Pennsylvania concluded that the ALJ erred in failing to include significant mental limitations in a hypothetical.  In *Covington*, the ALJ posed a hypothetical to the VE that made no mention of the claimant's BIF.

25

The court remanded, saying:

> . . . the Commissioner points to Covington's achievement of a high school diploma, at age 26, as well as her attendance at two semesters of college.  The Social Security Administration has recognized "even someone with formal schooling may be deemed illiterate" and that a claimant's achieved "numerical grade level" does not necessarily correspond to "actual educational abilities." In fact . . . "a third-grade reading level is so low that it calls into question whether plaintiff is functionally illiterate, particularly in light of plaintiff's other testimony that he had been placed in special education classes."
>
> In an evaluation credited by the ALJ, [the doctor] assessed Covington to read and spell at a third grade level.  The ALJ posed a hypothetical question to the vocational expert that assumed a claimant with Covington's education level; yet, the ALJ made no effort to incorporate [the doctor's] assessment or Covington's placement in special education. . . .  [T]he Court wishes to note that the level of schooling achieved by Covington is not determinative of the severity of her impairment, nor should it serve as a basis to discount Covington's learning disorder at step five.

*Covington*, 2011 WL 1539786 at *11-12 (internal citations omitted).  The same is true here where, as the ALJ noted, Robinson's "borderline intellectual functioning and anxiety disorder [] demonstrates the presence of severe impairments that significantly limit [her] ability to perform work-related activities."  (Tr. 37-38).

Accordingly, the court should reverse and remand so that the ALJ can reformulate proper hypothetical questions to the VE that include Robinson's BIF diagnosis.[14]

---

[14] Robinson also argues that the ALJ's hypothetical question did not accurately portray her physical and mental impairments and, specifically, did not include her difficulties with "deployment and concentration, and attention."  (Doc. #7 at 7).  It is true that, in some instances, a hypothetical that simply limits a claimant to unskilled work may fail to capture a claimant's moderate limitation in concentration, persistence or pace.  *See, e.g., Schalk v. Comm'r of Soc. Sec.,* 2011 WL 4406824 (E.D. Mich. Aug. 30, 2011).  In this case, however, the ALJ limited Robinson to unskilled work *that did not involve multitasking*, which may have been designed to address Robinson's difficulties with concentration and attention.  (Tr. 36-38).  On remand, however, the ALJ's hypothetical should clearly reflect all of Robinson's mental limitations, and other restrictions, including, if determined to be appropriate, that she have a job coach.  *See supra*, fn. 11.

III.    **CONCLUSION**

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [8] be DENIED, Robinson's Motion for Summary Judgment [7] be GRANTED IN PART to the extent it seeks remand, and DENIED IN PART to the extent it seeks an award of benefits, and that this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.


Dated: May 24, 2012                         s/David R. Grand_____
Ann Arbor, Michigan                         DAVID R. GRAND
                                            United States Magistrate Judge



**NOTICE**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on May 24, 2012, the foregoing document was served upon counsel of record via the Court's ECF System.

<u>s/William Barkholz for Felicia M. Moses</u>
FELICIA M. MOSES
Case Manager
